IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| POWERWATCH SYSTEMS LLC<br><br>　　　　　　　Plaintiff,<br><br>　v.<br><br>ACER INC. AND ACER AMERICA CORPORATION.<br><br>　　　　　　　Defendant. | Civil Action No. 6:25-cv-519<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff PowerWatch Systems LLC ("PowerWatch" or "Plaintiff"), for its Complaint against Defendants Acer Inc. and Acer America Corporation (referred to herein as "Acer" or "Defendants"), alleges the following:

## NATURE OF THE ACTION

1.     This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq.*

## THE PARTIES

2.   Plaintiff PowerWatch Systems LLC is a limited liability company organized under the laws of the State of Texas with a presence in Longview, Texas.

3.   On information and belief, Acer Inc. is a corporation organized under the laws of Taiwan, with a principal place of business at 1F, 88, Sec. 1, Xintai 5th Rd. Xizhi, New Taipei City 221.

4.   Upon information and belief, Acer America Corporation is a corporation organized under the laws of California, with its principal place of business at 1730 North First Street, Suite 400, San Jose, CA 95112.

5.   Upon information and belief, Acer sold, offered to sell, and/or used products and services throughout the United States, including in this judicial district, and introduced infringing products and services into the stream of commerce knowing that they would be sold and/or used in this judicial district and elsewhere in the United States during the relevant time period for the patents in suit.

## JURISDICTION AND VENUE

6.     This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

7.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

8.     Venue is proper in this judicial district under 28 U.S.C. § 1400(b).

9.     This Court has personal jurisdiction over Acer because they have, directly and/or through agents and/or intermediaries, committed acts and continues to commit acts of patent infringement, including within Texas, giving rise to this action, and have established minimum contacts with Texas such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice. Defendants, directly and/or indirectly at least through agents and intermediaries, have committed and continue to commit acts of infringement in this District by, among other things, making, using, selling, offering to sell, and importing the Accused Products during the relevant damages period.

10.     On information and belief, Acer regularly conducts business in Texas, including in this District, and purposefully avails itself of the privileges of conducting business in Texas and this District. In particular, on information and belief, Acer, and/or their agents and/or intermediaries, make, use, import, offer for sale, sell, and/or advertise their products and affiliated services in Texas and this District, including but not limited to the Accused Products, sufficient to give rise to jurisdiction. On information and belief, Defendants have placed Accused

Products into the stream of commerce, via an established distribution channel, with the knowledge and/or understanding that such products are sold in the United States, including in Texas, and specifically including in this District during the relevant damages period.

11.     On information and belief, Acer derives substantial revenue from the sale of Accused Products distributed within Texas, including within this District, and/or expects or should reasonably expect its actions to have consequences in Texas. In addition, on information and belief, Defendants knowingly induce, and continue to knowingly induce, infringement of the Asserted Patents within Texas and within this District by offering for sale, selling, and/or contracting with others to market Accused Products with the intent to facilitate infringing use of the products by others and by creating and/or disseminating product information and other materials providing instruction for infringing use during the relevant damages period.

12.     Defendants' infringing activity has led to foreseeable harm and injury to PowerWatch.

13.     Venue is proper under 28 U.S.C. § 1391 and 28 U.S.C. § 1400(b). Defendant Acer Inc. does not reside in the United States, and thus venue is appropriate in this District under 28 U.S.C. § 1391(c)(3).  In addition to the facts set forth above, Defendant Acer America Corporation has committed acts of infringement in this District and has a regular and established place of business in this District, including at least because it conducts business at least through its service center located in this District at 1394 Eberhardt Road, Temple, Texas 76504.

## BACKGROUND

### The Invention

14.     The inventions cover fast and efficient techniques of accessing different types of volatile and non-volatile memory known as Dynamic Random Access Memory ("DRAM") and Dual In-line Memory Module ("DIMM").  Such technology with memory components is used in

different computer products, including Personal Computers, Desktop Computers, Printers, and Servers.

15.     The inventions originate from different semiconductor technology companies, including Cypress Semiconductor Corp., Flash Semiconductor LLC, and Carmel Semiconductor LLC.  PowerWatch recently acquired the patent portfolio originating from these cutting-edge semiconductor companies.

16.     The asserted patents are U.S. Patent No. 6,680,516 ("the '516 patent"), 6,825,526 ("the '526 patent"), 7,158,429 ("the '429 patent"), 6,573,753 ("the '753 patent"), 6,366,145 ("the '145 patent"), 6,979,640 ("the '640 patent"), and 6,963,108 ("the '108 patent") (collectively, "the patents in suit").

17.     Alain Blosse and Krishnaswamy Ramkumar are the inventors of the '516 patent. A true and correct copy of the '516 patent is attached as Exhibit 1A. The '516 patent resulted from the pioneering efforts of Alain Blosse and Krishnaswamy Ramkumar.  These efforts resulted in the development of a method and apparatus for "Controlled Thickness Gate Stack" in December, 2002.  At the time of these pioneering efforts, the most widely implemented technology used to address the size of the semiconductor structure based on the layers that an element sits in caused, for example, large aspect ratios for contact vias, and such vias may not be properly filled.  In that type of system, for example, the thickness of a nitride layer necessary for forming SAC may still need to be at least 800 angstroms even when the size of an element is reduced.  The Inventors conceived of the inventions claimed in the '516 patent as a way to reduce the overall gate stack size that results in a smaller semiconductor substructure.

18.     For example, the Inventors developed a semiconductor substrate, a gate layer on the semiconductor substrate, a metallic layer on the gate layer, and an etch-stop layer on the

metallic layer. A distance between the substrate and the top of the etch-stop layer is the gate

stack height, and the gate stack height is at most 2700 angstroms

19.     Yue-Song He, Nian Yang, and Zhigang Wang are the inventors of the '526 patent.

A true and correct copy of the '526 patent is attached as Exhibit 2A.  These efforts resulted in the

development of a method and apparatus for "Structure For Increasing Drive Current In A

Memory Array And Related Method" in January 2004.  At the time of these pioneering efforts,

the most widely implemented technology used to address an increase in channel width caused an

undesirable increase in the size of the flash memory array whenever a drive current needed to be

increased for faster access of the memory array.  In that type of system, an increase in drive

current could not be achieved without increasing the size of the flash memory array, and

subsequently, the advantages of having a smaller flash memory array for faster access could not

be achieved.  The Inventors conceived of the inventions claimed in the '526 patent as a way to

structure for increasing drive current in memory array without increasing the overall size of the

memory array.

20.     For example, the Inventors developed a memory array comprising first and

second isolation regions situated in a substrate, where the first and second isolation regions are

separated by a separation distance. The memory array may, for example, be a floating gate flash

memory array. The memory array further comprises a trench situated between the first and

second isolation regions, where the trench defines trench sidewalls and a trench bottom in the

substrate. The memory array further comprises a tunnel oxide layer situated between the first and

second isolation regions, where the tunnel oxide layer is situated on the trench sidewalls and the

trench bottom.

21.     Gary Peter Moscaluk and John Eric Gross are the inventors of the '429 patent.  A true and correct copy of the '429 patent is attached as Exhibit 3A.  These efforts resulted in the development of a method and apparatus for "System for read path acceleration" in March 2003.  At the time of these pioneering efforts, the most widely implemented technology used to address transmitting signals over long distances on integrated circuits, for instance, at high clock speeds and complex circuits, would lead to virtual data or crowbar situations.  (*See* '429 Patent at 4:40-45.)  In that type of system, the circuits could achieve wrong voltage levels, leading to data corruption that could trigger a virtual data or crowbar situation, resulting in an overall slowdown of the path to access data.  (*Id.*)  The Inventors conceived of the inventions claimed in the '429 patent as a way to read path acceleration that overcomes these problems by using a memory core divided into a number of segments.

22.     For example, the Inventors developed a method and apparatus wherein each segment has a number of local amplifiers coupled to a pair of global read data lines. A main amplifier has an input coupled to the pair of global read data lines and has an output coupled to an output register. In one embodiment, a main amplifier strobe is coupled to each segment of a number of local strobe reset circuits. A second main amplifier strobe may be coupled to the main amplifier. In one embodiment, the second main amplifier is coupled to an equalization circuit.

23.     Warren Snyder is the inventor of the '753 patent. A true and correct copy of the '753 patent is attached as Exhibit 4A.  These efforts resulted in the development of a method and apparatus for "Microcontroller input/output nodes with both programmable pull-up and pull-down resistive loads and programmable drive strength" in July 2001.  At the time of these pioneering efforts, the most widely implemented technology used to address overcoming hostile environments with temperature extremes, wet and dry conditions and other hostilities for

electrical environments was by controlling the drive strength in input and output nodes of a controller or circuit.  In that type of system, simple on/off selection was insufficient to meet the needs of a dynamic environment and voltage could not be changed at nuanced levels.  The Inventor conceived of the inventions claimed in the '753 patent as a way to control the drive strength of an input/output pin with sufficient resolution to meet most foreseeable electronic environments in which an I/O pin will need to operate.  Such control over drive strength gave the ability to transmit or receive data in virtually any electronic environment. Another advantage is the ability to reduce voltage ramp-rates, which reduces high frequency harmonics and the attendant electromagnetic interference.

24.     For example, the Inventors developed an input/output node in an electronic device which comprises an input/output pin, a plurality of programmable pull-up resistors and a plurality of programmable pull-down resistors. Each of the pull-up and pull-down resistors, or a combination of them, can be activated by turning on or off n-MOS and p-MOS transistors with logic contained in a mode register. The pull-up and pull-down resistance can be implemented by the inclusion of a resistor in series or by the utilization of the innate resistance of the MOS-FET transistor itself. The resistances can be strong, medium, or weak, depending on the needs of the circuitry. One advantage of such control over drive strength is the ability to transmit or receive data in virtually any electronic environment. Another advantage is the ability to reduce voltage ramp-rates, which reduces high-frequency harmonics and the attendant electromagnetic interference.

25.     Bertrand J. Williams, Kamal Dalmia, Terry D. Little and Timothy D. Jordan are the inventors of the '145 patent.  A true and correct copy of the '145 patent is attached as Exhibit 5A.  These efforts resulted in the development of a method and apparatus for "Linearized digital

phase-locked loop" in May 2000.  At the time of these pioneering efforts, the most widely implemented technology used to address excessive jitter and clock recovery in every cycle using bang-bang approach was disadvantageous with clock shrinkage and expansion at every edge.  In that type of system, the use of over sampling methods to determine in which quadrant of the clock the data edge resides. The quadrant information is then applied to an adjustment mechanism, which moves the clock in the appropriate direction at each interval. No information associated with the magnitude of phase error is retained or utilized. Polarity of the error and presence of a data transition are the only information used to adapt the phase of the clock to the incoming data stream.  The Inventors conceived of the inventions claimed in the '145 patent as a way to use a detector and a control circuit. The detector may be configured to produce a value representing a position of an edge of said data signal based upon a state of said clock signal. The control circuit may be configured to adjust the clock signal based upon the value.

26.     For example, the Inventors developed an apparatus for synchronizing a clock signal to a data signal. The apparatus comprises a detector and a control circuit. The detector may be configured to produce a value representing a position of an edge of said data signal based upon a state of said clock signal. The control circuit may be configured to adjust the clock signal based upon the value.

27.     Alain Blosse and Sanjay Thekdi are the inventors of the '640 patent.  A true and correct copy of the '640 patent is attached as Exhibit 6A.  These efforts resulted in the development of a method and apparatus for "Contact Structure and Method of making the same" in March 2002.  At the time of these pioneering efforts, the most widely implemented technology used to metallic contacts within the semiconductor structure for electrical contacts that often had the disadvantage of not allowing further shrinkage of the semiconductor devices.  In that type of

system, the vias could also be fully enclosed but would be larger in size. If the vias are not fully enclosed then they suffered from misaligned contacts. The Inventors conceived of the inventions claimed in the '640 patent as a way to create semiconductor structures with contact vias that do not have the above mentioned problems. The use of tungsten to form a contact via with the specific steps allowed greater flexibility in the structure.

28.    For example, the Inventors developed is a method of making a semiconductor structure, comprising forming a hole through a first dielectric layer; followed by forming a hole through an etch-stop layer, to expose a first conducting layer, and the thickness of the etch-stop layer is at least one-half the smallest line width of the first conducting layer.

29.    Inkuk Kang, Hiroyuki Kinoshita, Jeff P. Erhardt and Emmanuil H. Lingunis are the inventors of the '108 patent. A true and correct copy of the '108 patent is attached as Exhibit 7A. The '108 patent resulted from the pioneering efforts of the inventors. These efforts resulted in the development of a method and apparatus for "Recessed channel" in October, 2003. At the time of these pioneering efforts, the most widely implemented technology had no technique to address performance degradation, loss of charge, and leakage problems from transistors because of concerns of hitting a limit on downscaling the transistors and the shrinkage of the die area. In that type of system, the band gap and built-in potential at the source/body and drain/body junctions were non-scalable with he reduction of physical device dimensions, such as a reduction in channel length. There would be a charge loss in the oxide-nitride-oxide layer that caused damage during an erase cycle including undesirable hole injections. The Inventors conceived of the inventions claimed in the '108 patent as a formation structure of a memory-cell a recessed channel region that prevents performance degradation, loss of charge and leakage.

30.     For example, the Inventors developed a memory-cell that includes a semiconductor substrate having at least one trench formed in a surface thereof, and a recessed channel region of a first conductivity type semiconductor is formed in the semiconductor substrate below each trench. A source region and a drain region both of a second conductivity type semiconductor formed in the semiconductor substrate on opposing sides of each trench, wherein a bottom of the source region and a bottom of the drain region are above a floor of the trench. A gate dielectric layer is formed on the semiconductor substrate, the gate dielectric layer being formed along the bottom and sidewalls of the trench, and a control gate is formed over the gate dielectric layer above the recessed channel region.

**Exemplary Advantages Over the Prior Art**

31.     The patented inventions disclosed in the '516 patent provides many advantages over the prior art, and in particular improved the operations of reducing the size of the structure when the size of the elements within is also reduced.  (*See* '516 patent at 2:40-45.)  One advantage of the patented inventions is smaller aspect ratios for contact vias that can be properly filled.  (*See* '516 patent at 5:22-34.)

32.     Another advantage of the patented inventions is a nitride layer that may be used for forming Self-aligned contacts (SAC) and may be used in designs that have a significantly reduced device size..  (*See* '516 patent at 2:42-45; 6:5-41.)

33.     The patented inventions disclosed in the '526 patent provides many advantages over the prior art, and in particular improved the operations of a floating gate flash memory array, having increased drive current, where the increased drive current is achieved without increasing the size of the flash memory array.  (*See* '526 patent at 1:53-58.)  One advantage of the patented inventions is that memory with increased speed and reduced power consumption is

possible even after increasing drive current and reducing cell dimensions. (*See* '526 patent at 1:59-2:13.)

34.    Another advantage of the patented inventions is that the memory cell channel width is increased without increasing the overall memory cell size. (*See* '526 patent at 5:48-57.)

35.    The patented inventions disclosed in the '429 patent provides many advantages over the prior art, and in particular improved the operations of read path acceleration system, which allows fast access of the data without the risk of virtual data or crowbar situations. (*See* '429 patent at 4:40-45.) One advantage of the patented inventions is read path acceleration that overcomes these problems and has a memory core divided into a number of segments. Each segment has a number of local amplifiers coupled to a pair of global read data lines. A main amplifier has an input coupled to the pair of global read data lines and has an output coupled to an output register. In one embodiment, a main amplifier strobe is coupled to each segment of a number of local strobe reset circuits. A second main amplifier strobe may be coupled to the main amplifier. In one embodiment, the second main amplifier is coupled to an equalization circuit. (*See* '429 patent at 2:22-34.)

36.    Another advantage of the patented inventions is smoother and efficient timing requirements that work with increasing clock speed and complex circuits. (*See* '429 patent at 5:43-64.)

37.    The patented inventions disclosed in the '753 patent provides many advantages over the prior art, and in particular improved the operations of resistances that can be configured to be strong, medium, or weak, depending on the needs of the circuit. (*See* '753 patent at 2:10-12.) One advantage of the patented inventions is control over drive strength that gives

subsequent control in ability to transmit or receive data in electronic environment that could be in hostile surroundings. (*See* '753 patent at 2:12-14.)

38.     Another advantage of the patented inventions is the ability to reduce voltage ramp-rates, which in turn reduces high-frequency harmonics and the attendant electromagnetic interference. (*See* '753 patent at 2:14-16.)

39.     The patented inventions disclosed in the '145 patent provides many advantages over the prior art, and in particular improved the operations of faster and more efficient synchronizing of clock and data signals. (*See* '145 patent at 1:55-62.) One advantage of the patented inventions is that the clock do not have to be recovered at every cycle or edge, and the clock corrects with adjustments in value instead of recovering from scratch. (*See* '145 patent at 1:57-61.)

40.     Another advantage of the patented inventions is that the bang-bang conventional approach no longer needs to be used. Instead of snapshots, there is real-time tracking and correction of the clock signal. (*See* '145 patent at 4:34-53.)

41.     Another advantage of the patented inventions is that the clock signal is tracked and locked truly based on adjusted values instead of snapshots or recoveries at every edge or cycle. (*See* '145 patent at 4:40-46.)

42.     The patented inventions disclosed in the '640 patent provides many advantages over the prior art, and in particular improved the operations of faster and more efficient contact vias in semiconductor structures. (*See* '640 patent at 2:48-62.) One advantage of the patented inventions is that the semiconductor structure does not have misaligned contact issues and can also be reduced in size further. (*See* '640 patent at 2:25-45.)

43.     Another advantage of the patented inventions is issues of long narrow channel with volatile material remaining at the bottom of the channel are gone.  (*See* '640 patent at 2:34-45.)

44.     Another advantage of the patented inventions is that the structure can be aligned without requiring a fully enclosed contact.  (*See* '640 patent at 2:25-45.)

45.     The patented invention disclosed in the '108 patent, provides many advantages over the prior art, and in particular improved the operations of memory having reduced channel effects.  (*See* '108 patent at 1:5-9; 2:7-12.)  One advantage of the patented invention is prevent performance degrading effects, loss of charge or leakage in memory components.  (*See* '108 patent at 4:66-5:9.)

46. Another advantage of the patented invention is reducing the short channel effect when using small field effect transistor.  (*See* '108 patent at 4:66-5:9.)

47.     Another advantage of the patented invention memory cells can be formed in bulk format (for example, the active region being formed in a silicon substrate) or in a semiconductor-on-insulator (SOI) format (for example, in a silicon film that is disposed on an insulating layer that is, in turn, disposed on a silicon substrate).  (*See* '108 patent at 4:62-65.)

48.     Because of these and other significant advantages that can be achieved through the use of the patented invention, PowerWatch believes that the '516, '526, '429, '753, '145, '640, and '108 patents in suit present significant commercial value for companies like Acer.  Indeed, DRAM, SDRAM, DDR, and DIMM are commercially successful and an integral part of fast and efficient computer systems, including memory components.  Such inventions make gaming consoles, virtual realities, and video conferencing in real time possible.

**Technological Innovation**

49.    The patented inventions disclosed in the '516 patent resolve technical problems related to semiconductors, particularly problems related to the utilization of electronic circuits. As the '516 patent explains, one of the limitations of the prior art as regards reducing the overall semiconductor structure when the elements within are reduced in size was that such large structures required large aspect ratios for contact vias, and the vias would not be properly filled. (*See* '516 patent at 1:26-27.)

50.    The claims of the '516 patent do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '516 patent recite inventive concepts that are deeply rooted in engineering technology and overcome problems specifically arising out of how to reduce the size of different semiconductor layers without compromising on the functionality.

51.    In addition, the claims of the '516 patent recite inventive concepts that improve the functioning of DRAM, DIMM, SDRAM, DDR3, or later versions, allow a small structure size with small-sized elements.

52.    Moreover, the claims of the '516 patent recite inventive concepts that are not merely routine or conventional use of different semiconductor substructure layers.  Instead, the patented inventions disclosed in the '516 patent provides a new and novel solution to specific problems related to improving smaller-sized structures arranged in a specific manner to allow for reduced element size within.

53.    And finally, the patented inventions disclosed in the '516 patent do not preempt all the ways that semiconductor layers can be structured and may be used to improve the use of small-sized elements in the semiconductor structure to allow for overall reduction in the size of the component, nor does the '516 patent preempt any other well-known or prior art technology.

54.     The patented inventions disclosed in the '526 patent resolve technical problems related to memory arrays, particularly problems related to the utilization of reduced memory cell sizes with increased drive current without increasing the size of the memory array.  As the '526 patent explains, one of the limitations of the prior art as regards to the memory structure with channel and trench areas that allow for small sizes was that the drive current could not be increased because of the limitations in the increase in the size of the channel and separation distance between two isolated regions.  (*See* '526 patent at 1:39-45.)

55.     The claims of the '526 patent do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '526 patent recite inventive concepts that are deeply rooted in engineering technology and overcome problems specifically arising out of how to erase all memory cells using a single current pulse.

56.     In addition, the claims of the '526 patent recite inventive concepts that improve the functioning of DRAM, DIMM, SDRAM, DDR3, or later versions, particularly allowing effective channel width to be greater than the separation distance between two or more isolated regions in a memory array.

57.     Moreover, the claims of the '526 patent recite inventive concepts that are not merely routine or conventional use of memory cells.  Instead, the patented inventions disclosed in the '526 patent provides a new and novel solution to specific problems related to improving faster access of reduced memory cell dimensions without needing to increase the size of the channel for isolation.

58.     And finally, the patented inventions disclosed in the '526 patent do not preempt all the ways that regions can be isolated, as well as how an erase pulse can propagate through

memory cells, which may be used to improve the access of data in small sized memory cells, nor does the '526 patent preempt any other well-known or prior art technology.

59.     The patented inventions disclosed in the '429 patent resolve technical problems related to read path acceleration in a memory component, particularly problems related to the utilization of fast access of data without risk of virtual data or crowbar situation.  (*See* '429 Patent at 4:40-45.)  As the '429 patent explains, one of the limitations of the prior art as regards to accessing data was that failure of timing requirements caused data to be corrupt or trigger crowbar circuits.  (*See* '429 patent at 1:43-45, and 4:40-45.)

60.     The claims of the '429 patent do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '429 patent recite inventive concepts that are deeply rooted in engineering technology and overcome problems specifically arising out of how to accelerate the read path to allow for fast data access in the memory components.

61.     In addition, the claims of the '429 patent recite inventive concepts that improve the functioning of DRAM, DIMM, SDRAM, DDR3 or later versions, particularly faster access to data by accelerating the read path that does not cause risk of virtual data or crowbar situations. (*See* '429 Patent at 4:40-45.)

62.     Moreover, the claims of the '429 patent recite inventive concepts that are not merely routine or conventional use of data access in the memory.  Instead, the patented inventions disclosed in the '429 patent provides a new and novel solution to specific problems related to improving use of amplifiers and equalization circuits that allow for read path acceleration.

63.     And finally, the patented inventions disclosed in the '429 patent do not preempt all the ways that data is accessed from memory may be used to improve the memory components, nor does the '429 patent preempt any other well-known or prior art technology.

64.     The patented inventions disclosed in the '753 patent resolve technical problems related to semiconductors, particularly problems related to the utilization of electronic circuits. As the '753 patent explains, one of the limitations of the prior art as regards the resistance and drive currents in electronic devices was that electronic components would fail and not operate properly in hostile environments, including temperature extremes, wet and dry conditions, or other hostile conditions.  (*See* '753 patent at 1:31-45.)

65.     The claims of the '753 patent do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '753 patent recite inventive concepts that are deeply rooted in engineering technology, and overcome problems specifically arising out of how to reconfigure resistance to be strong, medium or weak and subsequently have a nuanced control of the voltage and drive current in electronic devices.

66.     In addition, the claims of the '753 patent recite inventive concepts that improve the functioning of electronic devices including DRAM, DIMM, SDRAM, DDR3 or later versions, particularly not a crude turn on or off switch, but a dynamically reconfigurable resistance that can adjust the drive current in the electronic device and allow the input/output nodes to operate properly.

67.     Moreover, the claims of the '753 patent recite inventive concepts that are not merely routine or conventional use of resistors.  Instead, the patented inventions disclosed in the

'753 patent provides a new and novel solution to specific problems related to improving control over drive current by reconfiguring resistance within the electronic structure.

68.    And finally, the patented inventions disclosed in the '753 patent do not preempt all the ways that resistors can be configured and may be used to improve the reconfigurability of resistors, nor does the '753 patent preempt any other well-known or prior art technology.

69.    The patented inventions disclosed in the '145 patent resolve technical problems related to semiconductors, particularly problems related to the utilization of electronic circuits. As the '145 patent explains, one of the limitations of the prior art as regards to the synchronizing clock and data signals was that bang-bang approach or taking snapshots at varying time intervals required full clock recovery on every cycle or every edge.  (*See* '145 patent at 1:20-28.)

70.    The claims of the '145 patent do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '145 patent recite inventive concepts that are deeply rooted in engineering technology, and overcome problems specifically arising out of how to avoid excessive jitter in a resulting or recovered clock without clock shrinking or expanding at every edge.

71.    In addition, the claims of the '145 patent recite inventive concepts that improve the functioning of DRAM, DIMM, SDRAM, DDR3 or later versions, particularly adjusting the clock using value from a control signal.

72.    Moreover, the claims of the '145 patent recite inventive concepts that are not merely routine or conventional use of clock and data signal synchronization.  Instead, the patented inventions disclosed in the '145 patent provides a new and novel solution to specific

problems related to improving clock signal adjustment using a detector and control circuitry that adjusts the value of the clock instead of recovering the clock in its entirety.

73.    And finally, the patented inventions disclosed in the '145 patent do not preempt all the ways that clock signal can be synchronized and may be used to improve the detection of the clock signal and subsequent adjust using a detector and control value, nor does the '145 patent preempt any other well-known or prior art technology.

74.    The patented inventions disclosed in the '640 patent resolve technical problems related to semiconductors, particularly problems related to the making and use of contact vias in electronic circuits.  As the '640 patent explains, one of the limitations of the prior art as regards to the limitations on reducing the semiconductor structure size with use of metallic vias.  (See '640 patent at 2:25-45.)

75.    The claims of the '640 patent do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '640 patent recite inventive concepts that are deeply rooted in engineering technology and overcome problems specifically arising out of how to avoid misaligned contact vias in semiconductor structures without requiring full enclosure.

76.    In addition, the claims of the '640 patent recite inventive concepts that improve the functioning of DRAM, DIMM, SDRAM, DDR3, or later versions, particularly adjusting the interconnections and the conducting layer functions in a semiconductor structure.

77.    Moreover, the claims of the '640 patent recite inventive concepts that are not merely routine or conventional use of semiconductor structures.  Instead, the patented inventions disclosed in the '640 patent provides a new and novel solution to specific problems related to

improving contact vias that allows for flexibility in size without misalignments and connectivity issues.

78.    And finally, the patented inventions disclosed in the '640 patent do not preempt all the ways that semiconductor structures can be made and may be used to improve the connectivity and conducting layer between different components, nor does the '640 patent preempt any other well-known or prior art technology.

79.    The patented invention disclosed in the '108 patent resolves technical problems related to semiconductors, particularly problems related to the utilization of electronic circuits. As the '108 patent explains, one of the limitations of the prior art as regards the volatile and non-volatile memory having reduced short channel effects was that small memory cells in small die area resulted in performance degrading effects.  (*See* '108 patent at 1:30-33.)

80.    The claims of the '108 patent do not merely recite the performance of some well-known business practice from the pre-Internet world along with the requirement to perform it on the Internet.  Instead, the claims of the '108 patent recite inventive concepts that are deeply rooted in engineering technology and overcome problems specifically arising out of how to have small memory cells in a small die area, that have reduced SCE and for fabrication techniques to make those semiconductor devices. Furthermore, there was a need in the art for semiconductor devices that have reduced ONO damage during erase operations of the device.

81.    In addition, the claims of the '108 patent recite inventive concepts that improve the functioning of memory modules including DRAM, DIMM, DDR3 or later versions, SDRAM, particularly efficient recessed channel that allows for small memory cells in small die area.

82.    Moreover, the claims of the '108 patent recite inventive concepts that are not merely routine or conventional use of DDR3 or later versions, DIMM DRAM and SDRAM. Instead, the patented invention disclosed in the '108 patent provides a new and novel solution to specific problems related to improving use of small memory cells in small die area without performance degradation effects.

83.    And finally, the patented invention disclosed in the '108 patent does not preempt all the ways that trenches may be used within a semiconductor structure to improve the recessed channel area in a semiconductor substructure, nor does the '108 patent preempt any other well-known or prior art technology.

84.    Accordingly, the claims in the '516, '526, '429, '753, '145, '640 and '108 patents recite a combination of elements sufficient to ensure that the claim in substance and in practice amounts to significantly more than a patent-ineligible abstract idea.

**Prior Litigations**

85.    The '516 patent was previously litigated in the Western District of Texas, Civil Action No. 6-21-cv-00840, the District of Delaware, Civil Action Nos. 1-19-cv-02090, 1-19-cv-02083, and in the Patent Trial and Appeal Board, IPR Nos. 2021-00171, 2021-00119.  The scope and construction of the claims of the '516 patent have been clarified by the prior litigations.

86.    The '526 patent was previously litigated in the District of Delaware, Civil Action No. 1-19-cv-02090.  The scope and construction of the claims of the '526 patent have been clarified by the prior litigations.

87.    The '429 patent was previously litigated in the District of Delaware, Civil Action No. 1-19-cv-02090, the Northern District of California, Civil Action No. 3-13-cv-03757, the District of Minnesota, Civil Action No. 0-11-cv-00789, and in the Patent Trial and Appeal

Board, IPR 2021-00170.  The scope and construction of the claims of the '429 patent have been clarified by the prior litigations.

88.     The '753 patent was previously litigated in the Western District of Texas, Civil Action No. 6-21-cv-00542, and in the Patent Trial and Appeal Board, IPR 2022-00432.  The scope and construction of the claims of the '753 patent have been clarified by the prior litigations.

89.     The '640 patent was previously litigated in the Western District of Texas, Civil Action No. 6-21-cv-00542, 6-21-cv-00839, 6-21-cv-00936 and IPR 2022-00754, 2022-00540.  The scope and construction of the claims of the '640 patent have been clarified by the prior litigations.

90.     The '108 patent was previously litigated in the District of Delaware, Civil Actions Nos. 1-23-cv-00005, 1-22-cv-00293, 1-20-cv-00510, 1-20-cv-00511, 1-20-cv-00512, as well as in the Patent Trial and Appeal Board, IPR Nos. 2021-00726, 2021-00727, 2021-00728, 2021-00425, 2021-00426, 2021-00427.  The scope and construction of the claims of the '108 patent have been clarified by the prior litigations.

91.     On November 4, 2019, the previous patent owner, Monterey Research LLC, filed a lawsuit against Nanya Technologies Corp. in the U.S. District Court for the District of Delaware. That litigation was subsequently resolved through a settlement agreement between the parties. However, due to Nanya's improper performance under that agreement, no license was granted to Nanya Technologies Corp. or its customers. Accordingly, the claims in this action include allegations against Defendant products that incorporate Nanya chips.

## ACCUSED PRODUCTS AND ACCUSED INSTRUMENTALITIES

92.     "Accused Instrumentalities" as used herein refers to at least Defendant's systems and methods that include infringing memory cell components for volatile and non-volatile memory using at least one of the following: (i) DDR3 or later versions; (ii) DDR3 or later versions with ZQ calibration; (iii) DDR3 or later versions with ODT capabilities; (iv) DRAM with 75 nm nodes, 42 nm nodes or smaller; (v) DRAM using Recessed Channel Array Transistor (RCAT) technology; (vi) DRAM with RCAT technology where depth of the source/drain regions is about 40-60% of the depth of the RCAT trench; (vii) DDR3 or later versions with SDRAM. For example, including systems and methods using memory components from Kingston and ADATA or Nanya hardware chips. Upon information and belief, the exemplary version herein and previous versions of the Accused Instrumentalities distributed prior to expiration of the patents in suit operated materially in the same manner.

93.     Examples of infringing memory components used in Defendant's products include Nanya DRAMs, Nanya SDRAMs, Nanya DIMMs, Nanya DDR3 DIMMs, DDR3(L) SDRAM, Nanya DDR3 SDRAMs, Nanya NT5U64m16GG DRAM, Nanya NT5TU64M16GC-AC, Nanya Elixir N2CB2G80BN-CG 50 nm 2Gbit DDR3 SDRAM, Nanya SDRAM NT5TU64M16GG and Nanya SDRAM NT6TL64M32AQ along with any hardware and/or software.

94.     Defendants manufactured, provided, used, sold, offered for sale, imported, and/or distributed Accused Instrumentalities incorporated in its hardware products (collectively, "Accused Products"). For example, Acer Aspire branded products, Acer Aspire 5720z, Acer Aspire 5750, Acer Aspire Timeline X 5830TG, Acer UDD100 Desktop DRAM, Acer HT100 Desktop DRAM, Acer UD200 Desktop DRAM, Acer HT200 DDR5 Desktop DRAM, Acer SD100 Laptop DRAM, Acer SD200 Laptop DRAM, Acer Predator DRAM lines for Acer

Gaming, Acer Predator Apollo RGB DDR4 UDIMM, Acer Predator Vesta II DDR5 UDIMM,

Acer Predator Hera Special-Edition DDR5 UDIMM, Acer Desktops Aspire, Predator Orion,

Nitro using DDR4 via UD100/HT100, DDR5 through UD200 and HT200, DDR4 via SD100

SODIMM, DDR5 vis SD200 SODIMM including Nitro 5, Predator Helios, etc.), include

Accused Instrumentalities.  In addition, Acer's DRAM products line UD100, HT100, UD200,

HT200, SD100, SD200, Predator Apollo, Predator Vesta II, Predator Hera are also examples of

Accused Products.  Exhibit 8 includes evidence of the sale of the Accused Products during the

relevant damages period.

## NOTICE OF PATENTS IN SUIT

95.    Defendants had actual notice and/or knowledge of the '516 patent, the '526

patent, the '429 patent, the '753 patent, the '640, and the '108 patent since at least May 22, 2020,

when the prior patent owner sent a notice of patent infringement to Defendant, copy of the

original attached as Exhibit 9 that explicitly listed the patents in suit.

96.    Defendants have had knowledge of the patents in suit and its infringement since at

least the filing of the Original Complaint in this action, or shortly thereafter, including by way of

this lawsuit.

## OWNERSHIP OF PATENTS IN SUIT

97.    PowerWatch is the exclusive owner of all rights, title, and interest in the patents in

suit, including the right to exclude others and to enforce, sue and recover damages for past and

future infringement thereof.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 6,680,516

98.    The allegations set forth in the foregoing paragraphs 1 through 97 are

incorporated into this First Claim for Relief.

99.     On January 20, 2004, U.S. Patent No. 6,680,516 ("the '516 patent"), entitled "CONTROLLED THICKNESS GATE STACK," was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '516 patent is attached as Exhibit 1A.

100.     PowerWatch is the assignee and owner of the right, title and interest in and to the '516 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

101.     Upon information and belief, Defendants had during the relevant period directly infringed at least claims 5, 7 and 10 of the '516 patent by making, using, selling, importing and/or providing and causing to be used the Accused Instrumentalities.

102.     Exemplary infringement analysis showing infringement of claims 5, 7, and 10 of the '516 patent is set forth in Exhibit 1B.  This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Acer with respect to the '516 patent. PowerWatch reserves all rights to amend, supplement and modify this preliminary infringement analysis.  Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '516 patent.

103.     Since the actual notice of the '516 patent as noted above, Defendants' infringement has been willful.

104.     The '516 patent expired on December 6, 2022.  PowerWatch therefore asserts liability only for the period beginning May 22, 2020, and ending at the date of expiration on December 6, 2022.  Liability exists for this period because Defendants had actual notice of the patents and the period is within a six year look-back period from the date of the filing of the Complaint.

105.    PowerWatch has been harmed by Defendants' infringing activities.

**COUNT II – INFRINGEMENT OF U.S. PATENT NO. 6,825,526**

106.    The allegations set forth in the foregoing paragraphs 1 through 105 are incorporated into this First Claim for Relief.

107.    On November 30, 2004, U.S. Patent No. 6,825,526 ("the '526 patent"), entitled "STRUCTURE FOR INCREASING DRIVE CURRENT IN A MEMORY ARRAY AND RELATED METHOD," was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '526 patent is attached as Exhibit 2A.

108.    PowerWatch is the assignee and owner of the right, title and interest in and to the '526 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

109.    Upon information and belief, Defendants had during the relevant period directly infringed at least claim 1 of the '526 patent by making, using, selling, importing and/or providing and causing to be used the Accused Instrumentalities.

110.    Exemplary infringement analysis showing infringement of claim 1 of the '526 patent is set forth in Exhibit 2B.  This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Acer with respect to the '526 patent. PowerWatch reserves all rights to amend, supplement and modify this preliminary infringement analysis.  Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '526 patent.

111.    Since the date of actual notice of the patents in suit including the '526 patent, Defendants' infringement has been willful.

112.    The '526 patent expired on January 16, 2024.  PowerWatch therefore asserts liability only for the period beginning May 22, 2020, and ending at the date of expiration on

January 16, 2024.  Liability exists for this period because Defendants had actual notice of the patents and the period is within a six year look-back period from the date of the filing of the Complaint.

113.    PowerWatch has been harmed by Defendants' infringing activities.

### COUNT III – INFRINGEMENT OF U.S. PATENT NO. 7,158,429

114.    The allegations set forth in the foregoing paragraphs 1 through 113 are incorporated into this First Claim for Relief.

115.    On January 2, 2007, U.S. Patent No. 7,158,429 ("the '429 patent"), entitled "SYSTEM FOR READ PATH ACCELERATION," was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '429 patent is attached as Exhibit 3A.

116.    PowerWatch is the assignee and owner of the right, title and interest in and to the '429 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

117.    Upon information and belief, Defendants had during the relevant period directly infringed at least claims 2-3 of the '429 patent by making, using, selling, importing and/or providing and causing to be used the Accused Instrumentalities.

118.    Exemplary infringement analysis showing infringement of claims 2-3 of the  '429 patent is set forth in Exhibit 3B.  This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Acer with respect to the '429 patent.  PowerWatch reserves all rights to amend, supplement and modify this preliminary infringement analysis.  Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '429 patent.

119.    Since the date of actual notice of the patents in suit, including the '429 patent, Defendants' infringement has been willful.

120.    The '429 patent expired on August 15, 2024.  PowerWatch therefore asserts liability only for the period beginning May 22, 2020, and ending at the date of expiration. Liability exists for this period because Defendants had actual notice of the patents and the period is within a six year look-back period from the date of the filing of the Complaint.

121.    PowerWatch has been harmed by Defendants' infringing activities.

### COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 6,573,753

122.    The allegations set forth in the foregoing paragraphs 1 through 121 are incorporated into this First Claim for Relief.

123.    On July 20, 2001, U.S. Patent No. 6,573,753 ("the '753 patent"), entitled "MICROCONTROLLER INPUT/OUTPUT NODES WITH BOTH PROGRAMMABLE PULL-UP AND PULL-DOWN RESISTIVE LOADS AND PROGRAMMABLE DRIVE STRENGTH," was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '753 patent is attached as Exhibit 4A.

124.    PowerWatch is the assignee and owner of the right, title and interest in and to the '753 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

125.    Upon information and belief, Defendants had during the relevant period directly infringed at least claim 1 of the '753 patent by making, using, selling, importing and/or providing and causing to be used the Accused Instrumentalities.

126.    Exemplary infringement analysis showing infringement of claim 1 of the '753 patent is set forth in Exhibit 4B.  This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Acer with respect to the '753 patent.

PowerWatch reserves all rights to amend, supplement and modify this preliminary infringement analysis. Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '753 patent.

127.    Since the date of actual notice of the patents in suit, including the '753 patent, Defendants' infringement has been willful.

128.    The '753 patent expired on July 20, 2021. PowerWatch therefore asserts liability only for the period beginning May 22, 2020, and ending at the date of expiration. Liability exists for this period because Defendants had actual notice of the patents and the period is within a six year look-back period from the date of the filing of the Complaint.

129.    PowerWatch has been harmed by Defendants' infringing activities.

## COUNT V – INFRINGEMENT OF U.S. PATENT NO. 6,366,145

130.    The allegations set forth in the foregoing paragraphs 1 through 118 are incorporated into this First Claim for Relief.

131.    On May 12, 2000, a provisional application was filed followed by subsequent application on December 21, 2000, U.S. Patent No. 6,366,145 ("the '145 patent"), entitled "LINEARIZED DIGITAL PHASE-LOCKED LOOP," was duly and legally issued by the United States Patent and Trademark Office. A true and correct copy of the '145 patent is attached as Exhibit 5A.

132.    PowerWatch is the assignee and owner of the right, title and interest in and to the '145 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

133.    Upon information and belief, Defendants had during the relevant period directly infringed at least claim 11 of the '145 patent by making, using, selling, importing and/or providing and causing to be used the Accused Instrumentalities.

134.    Exemplary infringement analysis showing infringement of claim 11 of the '145 patent is set forth in Exhibit 5B.  This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Acer with respect to the '145 patent. PowerWatch reserves all rights to amend, supplement and modify this preliminary infringement analysis.  Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '145 patent.

135.    The '145 patent expired on December 21, 2020.  PowerWatch therefore asserts liability only for the period beginning six years prior to the filing of this action, *i.e.*, October, 2019 and ending at the date of expiration.

136.    PowerWatch has been harmed by Defendants' infringing activities.

### COUNT VI– INFRINGEMENT OF U.S. PATENT NO. 6,979,640

137.    The allegations set forth in the foregoing paragraphs 1 through 125 are incorporated into this First Claim for Relief.

138.    On March 29, 2002, an application was filed that issued as U.S. Patent No. 6,979,640 ("the '640 patent"), entitled "CONTACT STRUCTURE AND METHOD OF MAKING THE SAME," was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '640 patent is attached as Exhibit 6A.

139.    PowerWatch is the assignee and owner of the right, title and interest in and to the '640 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

140.    Upon information and belief, Defendant had during the relevant period directly infringed at least claims 1 and 2 of the '640 patent under 35 U.S.C. 271(g) by using, selling, importing and/or providing and causing to be used the Accused Instrumentalities.

141.    Exemplary infringement analysis showing infringement of claims 1 and 2 of the '640 patent is set forth in Exhibit 6B.  This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Acer with respect to the '640 patent. PowerWatch reserves all rights to amend, supplement, and modify this preliminary infringement analysis.  Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '640 patent.

142.    Since the date of actual notice of the patents in suit, including the '640 patent, Defendant's infringement has been willful.

143.    The '640 patent expired on March 29, 2022.  PowerWatch therefore asserts liability only for the period beginning October 2019 and ending at the date of expiration. Liability exists for this period because Defendant had actual notice of the patents and the period is within a six year look back period from the date of the filing of the Complaint.

144.    PowerWatch has been harmed by Defendant's infringing activities.

**COUNT I – INFRINGEMENT OF U.S. PATENT NO. 6,963,108**

145.    The allegations set forth in the foregoing paragraphs 1 through 144 are incorporated into this First Claim for Relief.

146.    On October 10, 2003, U.S. Patent No. 6,963,108 ("the '108 patent"), entitled "Recessed Channel," was duly and legally issued by the United States Patent and Trademark Office.  A true and correct copy of the '108 patent is attached as Exhibit 7A.

147.    PowerWatch is the assignee and owner of the right, title and interest in and to the '108 patent, including the right to assert all causes of action arising under said patents and the right to any remedies for infringement of them, including all past infringement.

148.    Upon information and belief, Defendants had at the relevant time directly infringed at least claim 1 of the '108 patent by making, using, selling, importing and/or providing and causing to be used the Accused Instrumentalities.

149.    Exemplary infringement analysis showing infringement of claim 1 of the '108 patent is set forth in Exhibit 7B.  This infringement analysis is necessarily preliminary, as it is provided in advance of any discovery provided by Acer with respect to the '108 patent. PowerWatch reserves all rights to amend, supplement and modify this preliminary infringement analysis.  Nothing in the attached chart should be construed as any express or implied contention or admission regarding the construction of any term or phrase of the claims of the '108 patent.

150.    Since the date of actual notice of the patents as noted above, Defendants' infringement has been willful.

151.    The '108 patent expired on October 10, 2023.  PowerWatch therefore asserts liability only for the period beginning May, 2020 and ending at the date of expiration on October 10, 2023.  .  Liability exists for this period because Defendants had actual notice of the patents, and the period is within six years look back period from the date of the filing of the Complaint.

152.    PowerWatch has been harmed by Defendants' infringing activities.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, PowerWatch demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

WHEREFORE, PowerWatch demands judgment for itself and against Acer as follows:

A.    An adjudication that Acer has infringed the '516 patent, the '526 patent, the '429 patent, the '753 patent, the '145 patent, the '640 patent, and the '108 patent;

B.      An award of damages to be paid by Acer adequate to compensate PowerWatch for Acer's past infringement of the '516 patent, the '526 patent, the '429 patent, the '753 patent, the '145 patent, the '640 patent, and the '108 patent, including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C.      A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of PowerWatch's reasonable attorneys' fees; and

D.      An award to PowerWatch of such further relief at law or in equity as the Court deems just and proper.


Dated: October 30, 2025                    DEVLIN LAW FIRM LLC


                                           */s/ Timothy Devlin*
                                           Deepali Brahmbhatt
                                           CA Bar No. 255646
                                           dbrahmbhatt@devlinlawfirm.com
                                           3120 Scott Blvd. #13
                                           Santa Clara, CA 95054
                                           Tel: (650) 254-9805

                                           Timothy Devlin
                                           1526 Gilpin Avenue
                                           Wilmington, Delaware 19806
                                           Telephone: (302) 449-9010
                                           Facsimile: (302) 353-4251

                                           *Attorneys for PowerWatch Systems LLC*